**Opinion issued July 23, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00015-CV

———————————

**TITLE RESOURCES GUARANTY COMPANY AS SUBROGEE OF SLS PROPERTIES, Appellant**

**V.**

**THE LIGHTHOUSE CHURCH & MINISTRIES, Appellee**

---

On Appeal from the 11th District Court
Harris County, Texas
Trial Court Case No. 2015-25934

---

**O P I N I O N**

Appellant Title Resources Guaranty Company ("TRG"), as subrogee[1] of SLS Properties ("SLS"), appeals the trial court's summary judgment in favor of Appellee / Cross-Appellant The Lighthouse Church & Ministries (the "Church"). In its summary judgment order, the trial court ruled that TRG take nothing by its contract cause of action. TRG asks that we reverse and render judgment in its favor on this claim. It contends that SLS and the Church's contract for the sale of land unambiguously obligated the Church to pay taxes that were imposed on the land post-sale under Tax Code Section 11.201(a). It also asks that we either render judgment in its favor on its claim for attorneys' fees or, if we affirm the summary judgment, affirm the ruling that neither party is entitled to attorneys' fees.

The trial court also granted summary judgment in TRG's favor, ruling that the Church take nothing by its counterclaims. The Church has now abandoned its counterclaims. It also cross-appeals for a rendition of judgment in its favor on its claim for attorneys' fees.

The contract gives rise to an ambiguity, even after interpreting the plain language of the competing contract provisions and applying the interpretive canons advanced by the parties. We therefore reverse the summary judgment in part and remand the case for further proceedings.

---

[1] The Church disputed in the trial court whether SLS was properly subrogated to TRG for purposes of this suit. The Church has conceded that issue in its appellate brief, so we need not analyze it.

**Background**

The Church acquired a tract of land in late 2011 and received an exemption from ad valorem taxes on the land under Tax Code Section 11.20(a)(6). That statute applies to certain land upon which a religious organization plans to expand or build a place of regular religious worship. TEX. TAX CODE § 11.20(a)(6)(A)–(B). If, however, the religious organization sells or transfers the land in a year in which the land is receiving the exemption, "an additional tax is imposed on the land equal to the tax that would have been imposed on the land had the land been taxed for each of the five years preceding the year in which the sale or transfer occurs in which the land received an exemption . . . ." *Id.* § 11.201(a).

Later, the Church agreed to sell the land to SLS. The parties entered into an Unimproved Property Contract in April 2014 to govern the sale. The Unimproved Property Contract stemmed from a form "promulgated by the Texas Real Estate Commission." Paragraphs 13(A) and 13(B) of the Unimproved Property Contract address "Prorations" and "Rollback Taxes," respectively. Because the land received the exemption under Section 11.20(a)(6) for tax years 2012, 2013, and 2014, the Church had not been required to pay taxes on the land for those years.

The Church and SLS closed the sale on May 30, 2014. Also on that day, they and the escrow agent for the sale executed an "Escrow With[h]old Agreement" (the "EWA"). Under the EWA, the escrow agent held an amount of

3

money deposited by the Church "for possible Tax Rollbacks until" the agent "receive[d] proof of . . . no additional taxes due from [the] Harris County Tax Assessor." If there were "additional amounts due beyond the amount withheld," the EWA required that "the seller will pay the additional monies to satisfy the amount due to the Tax assessor/collector."

SLS's title insurer for the sale was TRG, under an Owner's Policy of Title Insurance.

In October 2014, the Harris County Appraisal District ("HCAD") sent a letter to the Church and a copy of it to SLS. The letter advised that HCAD "has canceled the exemption on the" land sold by the Church to SLS, and it identified the exemption as the one provided by Section 11.20(a)(6). The letter went on to cite and paraphrase most of the language of Section 11.201(a).

Three taxing entities then demanded payment from SLS for ad valorem taxes relating to the land for tax years 2012, 2013, and 2014. TRG, on SLS's behalf due to the subrogation provisions of the title-insurance policy, demanded that the Church pay those taxes, as allegedly required by the provisions of SLS and the Church's contract of sale. The Church refused. TRG then paid the 2012 and 2013 taxes on SLS's behalf—ultimately $111,813.95 after certain refunds—in part to avoid accrual of penalties and interest and to allow SLS to protest the appraised value of the land that the taxing authorities used to calculate the taxes they

4

imposed under Section 11.201(a). For the 2014 taxes, SLS paid the amounts that accrued after the May 30, 2014 closing, and the funds that the Church deposited in escrow under the EWA paid off the amounts that had accrued for January through May 2014.

After SLS's appraisal protest was denied, SLS petitioned for judicial review of the protest in court. The protest suit was ultimately settled.

TRG, as subrogee of SLS, filed this suit against the Church. TRG pleaded causes of action for breach of contract and *quantum meruit*. It sought as damages the $111,813.95 that it had paid for 2012 and 2013 taxes, recovery of $44,776.50 for costs it allegedly incurred to mitigate its damages, and attorneys' fees. The Church answered and counterclaimed, but the Church represents on appeal that it has "clearly abandoned its counterclaims." However, it has not abandoned its claims for attorneys' fees under the Unimproved Property Contract's "prevailing party" provision.

TRG and the Church's dispute arises largely out of their competing interpretations of the documents that constitute SLS and the Church's contract of sale. In short, the Church contends that Paragraph 13(B) of the Unimproved Property Contract unambiguously required SLS to pay the 2012 and 2013 taxes imposed by the taxing authorities under Section 11.201(a). TRG contends that the EWA unambiguously required the Church to pay those taxes.

5

The parties cross-moved for summary judgment on their competing theories. On TRG's causes of action for breach of contract and *quantum meruit*, the trial court granted summary judgment in the Church's favor that TRG take nothing. On the Church's counterclaims, the trial court granted summary judgment in TRG's favor that the Church take nothing. The trial court also ruled that neither party was entitled to attorneys' fees.

The trial court's judgment, in effect, returned the parties to the *status quo ante*—TRG had paid the 2012 and 2013 taxes imposed under Section 11.201(a), and both parties took nothing by this suit. TRG appealed, and the Church cross-appealed.

## Contractual Obligation for Taxes Imposed Under Tax Code Section 11.201(a)

In its first issue, TRG contends that the contract unambiguously obligated the Church to pay the taxes imposed under Section 11.201(a). The Church's first issue is the mirror image of TRG's—that the contract unambiguously obligated TRG to pay those taxes.

## I. Standard of Review

We review orders granting or denying summary judgment, either traditional or no-evidence, de novo. *See Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017); *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 132 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Reiland v. Patrick Thomas Props.,*

6

*Inc.*, 213 S.W.3d 431, 435 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Traditional summary judgment is proper when a movant establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Reiland*, 213 S.W.3d at 435. No-evidence summary judgment is proper for a defendant on a plaintiff's cause of action when, after an adequate time for discovery, the defendant–movant shows that "there is no evidence of one or more essential elements of a claim or defense on which [the plaintiff] would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). Once the movant makes this showing, the burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the defendant's motion. *Johnson v. Phillips*, 526 S.W.3d 529, 534 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In reviewing a grant of summary judgment, we consider as true all evidence that favors the nonmovant, and we indulge every reasonable inference, and resolve all reasonable doubts, in the nonmovant's favor. *Reiland*, 213 S.W.3d at 435. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). A genuine issue of material fact exists when there is more than a scintilla of probative evidence on a particular issue. *See Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012) (per curiam).

7

"Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010) (internal quotations omitted). A summary judgment should not be granted unless the movant conclusively shows that there is no dispute about, among other things, "the inferences that may properly be drawn from the evidence." *Jones v. Mem'l Hosp. Sys.*, 746 S.W.2d 891, 896 (Tex. App.—Houston [1st Dist.] 1988, no writ).

Both TRG and the Church moved for summary judgment: (a) TRG, on only traditional grounds, both on its causes of action and on the Church's counterclaims and (b) the Church on both traditional and no-evidence grounds on TRG's causes of action and on only traditional grounds on its counterclaims. *See* TEX. R. CIV. P. 166a(a)–(c), (i).

When both parties move for summary judgment, and the trial court grants one motion and denies the other, the unsuccessful party may appeal both the successful party's motion and the denial of his or her own motion. *Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex. 1996); *Reiland*, 213 S.W.3d at 436. In such an appeal, we must review both sides' summary judgment evidence, determine all questions presented, and render the judgment that the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Reiland*, 213 S.W.3d at 436. We may affirm the

8

summary judgment or reverse and render judgment on the unsuccessful party's motion. *Holmes*, 924 S.W.2d at 922. "When, as here, a summary judgment order does not specify the grounds on which it was granted, we will affirm the judgment if any one of the theories advanced before the trial court is meritorious." *Bowers v. Taylor*, 263 S.W.3d 260, 263 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Both TRG and the Church are in the position of being both successful and unsuccessful on their respective cross-motions. The trial court granted the Church's motion as to TRG's causes of action, ruling that TRG take nothing by them, but it denied the rest of the Church's motion. It also ruled that TRG was entitled to summary judgment on the Church's counterclaims, but it otherwise denied TRG's motion.

## II. Applicable Tax Code Provisions

The parties' competing contract interpretations play out against the backdrop of Tax Code Sections 11.20 and 11.201. A qualified religious organization "is entitled to an exemption from taxation of:"

> the land that the religious organization owns for the purpose of expansion of the religious organization's place of regular religious worship or construction of a new place of regular religious worship if:
>
> > (A) the religious organization qualifies other property, including a portion of the same tract or parcel of land, owned by the organization for an exemption under Subdivision (1) or (5); and

9

> (B) the land produces no revenue for the religious organization.

TEX. TAX CODE § 11.20(a)(6); *see also* TEX. CONST. art. VIII, § 2 (authorizing such an exemption). This exemption expires after either one of two periods, depending on whether the land is contiguous with the religious organization's present place of regular religious worship:

> A tract of land that is contiguous to the tract of land on which the religious organization's place of regular religious worship is located may not be exempted under Subsection (a)(6) for more than six years. A tract of land that is not contiguous to the tract of land on which the religious organization's place of regular religious worship is located may not be exempted under Subsection (a)(6) for more than three years.

TEX. TAX CODE § 11.20(j). TRG and the Church agree that the land at issue was not contiguous to the Church's then-existing place of regular religious worship. The three-year period therefore controls.

> Selling the land during the three-year period results in an additional tax:

> If land is sold or otherwise transferred to another person in a year in which the land receives an exemption under Section 11.20(a)(6), an additional tax is imposed on the land equal to the tax that would have been imposed on the land had the land been taxed for each of the five years preceding the year in which the sale or transfer occurs in which the land received an exemption under that subsection, plus interest at an annual rate of seven percent calculated from the dates on which the taxes would have become due.

*Id.* § 11.201(a). No appellate court has interpreted Section 11.201(a).

Our primary objective in interpreting statutes is to give effect to the Legislature's intent. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). The

10

plain meaning of the statute's text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results. *Id.*

## III. The Contract

A key issue is the parties' competing interpretations of who the contract obligates to pay the taxes imposed under Section 11.201(a). Contract language that can be given a certain or definite meaning is unambiguous, and, in that situation, we interpret the contractual language as a matter of law. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999); *Castillo Info. Tech. Servs., LLC v. Dyonyx, L.P.*, 554 S.W.3d 41, 45 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Contract language is not ambiguous simply because it is unclear or because the parties "assert forceful and diametrically opposing interpretations." *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig. proceeding); *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 100. An ambiguity arises only after the application of established rules of interpretation leaves the language susceptible to more than one reasonable meaning. *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 100. If the contract remains ambiguous, a summary judgment is improper because the interpretation of the contract is then a question of fact for the factfinder. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).

Our primary concern when interpreting contract language is to ascertain the true intent of the parties as expressed in the contract language. *Castillo Info. Tech. Servs.*, 554 S.W.3d at 45. We interpret contract language according to its plain grammatical reading unless to do so would defeat the parties' intent. *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 101. We avoid unreasonable interpretations when possible and proper to do so. *Castillo Info. Tech. Servs.*, 554 S.W.3d at 45. We consider the entire contract, harmonizing and giving effect to all of the contract's provisions so that none will be rendered meaningless. *Id.* at 45–46; *IP Petrol. Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 899 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). No single provision taken alone is given controlling effect; each must be considered in the context of the contract as a whole. *Castillo Info. Tech. Servs.*, 554 S.W.3d at 46. We must not "make new contracts between the parties and must enforce the contract as written." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding).

Only if interpretation of the plain meaning of the contract's provisions results in an ambiguity do we then turn to interpretive canons to resolve the dispute. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 531–32 (Tex. 2015). And only if there is an ambiguity do we turn to extra-contractual expressions of intent, like the parties' conduct. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Consol. Eng'g Co. v. S. Steel Co.*, 699 S.W.2d

12

188, 192–93 (Tex. 1985); *Connelly v. Paul*, 731 S.W.2d 657, 660–61 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

TRG and the Church entered into the Unimproved Property Contract to govern the sale, and they later entered into other agreements just before, and at, closing. Those other agreements include the EWA. Both TRG and the Church ask us to read the Unimproved Property Contract and the EWA as part of one unified contract. Well-established law provides that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 & nn.14–17 (Tex. 2000); *Castillo Info. Tech. Servs.*, 554 S.W.3d at 46.

The Supreme Court of Texas has cast this approach in mandatory terms: "It is the settled rule in this State, as well as the rule generally, that written contracts executed in different instruments whereby a single transaction or purpose is consummated are to be taken and construed together as one contract." *Veal v. Thomason*, 159 S.W.2d 472, 475 (Tex. 1942). The Court has also said that, "[u]nder generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another." *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 102 & n.15.

In the same vein, our Court has held that we "must construe . . . together" instruments that "were executed near the same time, . . . involve[d] the same purpose, and . . . clearly pertain[ed] to the same transaction." *Castillo Info. Tech. Servs.*, 554 S.W.3d at 49. And, elsewhere, when a 1919 oil-and-gas lease and a 1927 deed "involve[d] the same parties and relate[d] to the same transaction, we construe[d] them together." *Bowers*, 263 S.W.3d at 266.

These principles apply here, so we will read the Unimproved Property Contract and the EWA as part of one unified contract, as both parties ask us to do.[2] Both parties cite *IP Petroleum* for this proposition. That case provides further guidance for what to do with two agreements that would otherwise be read together as part of one unified contract but that "cannot subsist together": "Only when the terms of one contract are so inconsistent with those of the other that the two cannot subsist together is there a presumption that the second super[s]eded the first." *IP Petrol.*, 116 S.W.3d at 899 (citing *Willeke v. Bailey*, 189 S.W.2d 477, 479 (Tex. 1945)).[3] When that case presented our Court with "two agreements contain[ing]

---

[2] Because we must read the Unimproved Property Contract and the EWA together as part of one unified contract, we may not reach TRG's alternative argument that the EWA is a contract separate from the Unimproved Property Contract and that the EWA therefore modified the Unimproved Property Contract.

[3] In the relevant passage from *Willeke*, the Court stated:

> With a jury finding that both contracts were made, it is quite evident that the terms of the one agreement are so inconsistent

14

mutually inconsistent terms," we held that the latter agreement superseded the prior one. *Id.* However, our Supreme Court has also instructed, and we have recently recognized the instruction, that "[i]n harmonizing [contract] provisions, terms stated earlier in an agreement must be favored over subsequent terms." *See Coker*, 650 S.W.2d at 393; *accord Gallis v. Papadogiannis*, No. 01-15-00794-CV, 2017 WL 711737, at *16 (Tex. App.—Houston [1st Dist.] Feb. 23, 2017, no pet.) (mem. op.); *Kilgore Expl., Inc. v. Apache Corp.*, No. 01-13-00347-CV, 2015 WL 505275, at *7 (Tex. App.—Houston [1st Dist.] Feb. 5, 2015, no pet.) (mem. op.).

## IV. The contract contains an ambiguity, even after interpreting the plain language of the competing provisions and applying the interpretive canons advanced by the parties.

### A. Paragraph 13(B)

We begin with the language in the Unimproved Property Contract referenced by both parties—Paragraph 13(B):

---

> with those of the other that the two cannot subsist together. In that situation the rule is that the one made first is conclusively presumed to have been superseded by the other.

189 S.W.2d at 479 (citing 17 C.J.S. *Contracts* § 395; 32 AM. JUR. *Landlord and Tenant* § 147).

15

ROLLBACK TAXES: If this sale or Buyer's use of the Property after closing results in the assessment of additional taxes, penalties or interest (Assessments) for periods prior to closing, the Assessments will be the obligation of Buyer. If Seller's change in use of the Property prior to closing or denial of a special use valuation on the Property claimed by Seller results in Assessments for periods prior to closing, the Assessments will be the obligation of Seller. Obligations imposed by this paragraph will survive closing.

The Church argues that this paragraph unambiguously required TRG to pay the taxes imposed under Section 11.201(a). According to the Church, the taxes imposed under Section 11.201(a) were "for periods prior to closing" and were triggered by "this sale."

The plain language of Section 11.201(a) strongly supports the Church's position. Section 11.201(a) provides that its "additional tax" is imposed when "land is sold or otherwise transferred to another person in a year in which the land receives an exemption under Section 11.20(a)(6)."[4]

TRG offers several reasons for why Paragraph 13(B) alone does not control the parties' dispute, but, for the moment, we analyze the competing arguments over only Paragraph 13(B). As to this paragraph's language alone, TRG argues that a "denial of a special use valuation," and not the sale of the land, triggered the taxes' imposition. This would mean that Paragraph 13(B)'s second sentence, rather than its first, should control. TRG also argues that the Church "changed its use" of the

---

[4]  Neither party contends that the taxing authorities misapplied Section 11.201(a) when they imposed the taxes under that statute.

16

land "when it decided to sell" the land to TRG, which would also trigger application of Paragraph 13(B)'s second sentence.

"Special use valuation" is not defined in either the Tax Code or any of the contract documents. We must therefore interpret the term according to its plain grammatical meaning. *See* TEX. GOV'T CODE § 312.002(a)–(b) (unless a statute's use of a "word is connected with and used with reference to a particular trade or subject matter or is used as a word of art," the word is given its "ordinary meaning"); *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 794–95 (Tex. 2012) ("[C]ontract terms are given their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." (internal quotation omitted)).

The plain grammatical meaning of "valuation" necessarily involves an assigning of a value, often numerical, to a thing. A prominent legal dictionary supports this reading. Its entry for "special-use valuation" is simply "See VALUATION." *Special-use valuation*, BLACK'S LAW DICTIONARY (10th ed. 2014). And its definition of "valuation" is

> 1. The process of determining the value of a thing or entity. 2. The estimated worth of a thing or entity. — value, valuate, *vb*.
>
> - assessed valuation (1825) The value that a taxing authority gives to property and to which the tax rate is applied.

17

- special-use valuation (1976) An executor's option of valuating real property in an estate, esp. farmland, based on its current use rather than for its highest potential value.

*Valuation*, BLACK'S LAW DICTIONARY (10th ed. 2014).

The Comptroller of Public Accounts also uses "special use valuation," in his office's regulation about taxpayer applications for the benefits provided by Tax Code chapter 23: "In applying for special use valuation under Tax Code, Chapter 23, the applicant shall use a form provided by the appraisal office." 34 TEX. ADMIN. CODE § 9.402(a) (2018) (Tex. Comptroller of Pub. Accounts, Special Use Application Forms). Chapter 23 of the Tax Code concerns appraisals of taxable property's market value and includes several special-appraisal provisions. *See generally* TEX. TAX CODE §§ 23.01–.9807. When a special-appraisal provision applies, the taxpayer enjoys a lower overall ad valorem tax burden on a particular property when that property is committed to a particular use. The particular use entitles the property to a below-market-value appraisal calculation.

Notably, Sections 23.55(a) and 23.76(a) provide for "an additional tax" like Section 11.201(a) provides, but for different triggering reasons. In both Sections 23.55(a) and 23.76(a), a change in land use triggers the tax: "If the use of land that has been appraised as provided by this subchapter changes, an additional tax is imposed on the land . . . ." *Id.* §§ 23.55(a), 23.76(a). But in Section 11.201(a), the land's being "sold or otherwise transferred to another person

in a year in which the land receives an exemption under Section 11.20(a)(6)" is what triggers the tax.

The differences between Section 11.201(a)'s triggering event and those in Sections 23.55(a) and 23.76(a), and the Comptroller's use of "special use valuation" to refer to what Chapter 23 concerns, buttress our plain-language reading of "special-use valuation" as necessarily involving an assigning of a value to a thing. Under Chapter 23, lowered appraisal calculations for the particular property lead to a lower ad valorem tax burden for the property's owner, when compared to what the tax burden would have been under the standard market-value appraisal. The lowered appraisal and the market-value appraisal are competing methods for assigning dollar values to things—they are valuations.

But in Sections 11.20(a)(6) and 11.201(a), the mechanism that lowers the tax burden is not an altered calculation for the assigning of a dollar value to the property but is instead an "exemption from taxation" altogether. *See* TEX. TAX CODE § 11.20(a). For over 80 years, our Supreme Court has distinguished tax-exemption statutes from tax-valuation statutes for many purposes. *See, e.g.*, *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 941 (Tex. 1996); *Hardin v. Cent. Am. Life Ins. Co.*, 374 S.W.2d 881, 883–84 (Tex. 1964); *Republic Ins. Co. v. Highland Park Indep. Sch. Dist.*, 102 S.W.2d 184, 193 (Tex. [Comm'n Op.] 1937). That distinction is relevant here. Section 11.20(a)(6) involves a tax

exemption rather than a special-use valuation. Therefore, we conclude that a "special use valuation" under Paragraph 13(B)'s second sentence is not at issue here.

As for TRG's argument that the Church's decision to sell the land, instead of the sale itself, triggered the taxes' imposition, TRG relies on the taxing authorities' notice letter about the taxes. And TRG argues that the Church "changed its use of the Property when it decided to sell the Property for profit rather than building a new worship facility." Therefore, TRG concludes, the Church was "responsible for the loss of the special use valuation. The fact [that] HCAD notified [the Church] of the rollback illustrates [the Church]'s responsibility for triggering the rollback taxes."

The Church responds that (1) SLS was copied on the same letter; (2) the letter's quoting from Section 11.201(a) means that it was the sale itself that triggered the taxes; (3) TRG itself pleaded in this suit that the "sale of the Property . . . caused HCAD to revoke the exemption"; (4) in SLS's suit against HCAD to protest the land's appraised value, SLS expressly pleaded that the sale of the property triggered the taxes; and (5) SLS's affiant in that suit averred similarly. In the suit against HCAD, SLS said in its dispositive motion that "[i]t is undisputed that [the Church]'s sale of the property to SLS triggered the loss of the complete exemption . . . under . . . Section 11.20."

Given all this, TRG's desired inference from the notice letter's being addressed to the Church is no more than a mere surmise or suspicion about whether the taxing authorities imposed the taxes for any reason other than what Section 11.201(a) requires—the sale itself. TRG's argument from the letter's being addressed to the Church is therefore unavailing. *See Buck*, 381 S.W.3d at 527 & n.2; *Regal Fin.*, 355 S.W.3d at 603.

This disposes of TRG's arguments solely from Paragraph 13(B)'s language. Accordingly, we conclude that, if Paragraph 13(B) were the only contract provision that purported to assign responsibility for the taxes imposed under Section 11.201(a), then TRG would be the party responsible to pay them because "this sale," and no other event contemplated by Paragraph 13(B)'s second sentence, triggered the new taxes "for periods prior to closing." But we now must address TRG's reliance on another portion of the parties' contract—the EWA.

**B.    The Escrow With[h]old Agreement (the "EWA")**

In the EWA, the parties (and the escrow agent for the sale) agreed to the following:

21

> Texas American Title Company is holding in escrow the amount of $23,149.38 for possible Tax Rollbacks until Texas American Title Co[.] receives proof of the removal of the TLX Exemptions for the seller & no additional taxes due from Harris County Tax Assessor; if there are amounts due they will be paid immediately by the escrow agent to the taxing entity & any balance returned to the seller; likewise if there are additional amounts due beyond the amount withheld, the seller will pay the additional monies to satisfy the amount due to the Tax assessor/collector. This withhold is not to exceed a period of 6 months. Once confirmation is received Texas American Title will release funds.

Nothing else in the contract documents defines "Tax Rollbacks" (or "TLX Exemptions"). The parties executed the EWA at closing, and only later did the taxing authorities impose the taxes. There was therefore no outstanding tax liability at the time of closing.

TRG argues that, under the EWA, the taxes imposed under Section 11.201(a) were "amount[s] . . . for possible Tax Rollbacks . . . due beyond the amount withheld." Therefore, TRG concludes that the Church was responsible to "pay the additional monies to satisfy the amount due to the Tax assessor/collector." TRG's reading is correct on the face of the EWA. The EWA, like Paragraph 13(B), is addressed to "rollback" taxes. And the plain meaning of the EWA's "amount[s] . . . for possible Tax Rollbacks . . . due beyond the amount withheld" and "additional monies to satisfy the amount due" encompasses the taxes.

The Church recognizes that this interpretation of the EWA conflicts with Paragraph 13(B). Therefore, it asks us to harmonize the EWA with Paragraph 13(B) by restricting the EWA's reach to only taxes potentially due for tax year 2014, the year in which the sale was agreed to and closed.

To make this argument, the Church begins by noting that the EWA "does not purport to amend" the Unimproved Property Contract, failing even to mention the document. The Church then marshals other contract provisions that it believes limit the EWA to taxes in tax year 2014. First, it notes Paragraph 13(A), which provides:

> PRORATIONS: Taxes for the current year, interest, maintenance fees, assessments, dues and rents will be prorated through the Closing Date. The tax proration may be calculated taking into consideration any change in exemptions that will affect the current year's taxes. If taxes for the current year vary from the amount prorated at closing, the parties shall adjust the prorations when tax statements for the current year are available. If taxes are not paid at or prior to closing, Buyer shall pay taxes for the current year.

Specifically, the Church highlights the provisions for prorating the "[t]axes for the current year" through the closing date and calculating the proration subject to any exemptions "that will affect the current year's taxes."

Next, the Church notes a line item in a closing statement executed by the parties. The line item says that $23,149.38 was being reduced from what would be paid to the Church at closing due to "Property Taxes from 1/1/2014 thru 5/30/2014 to be held in Escrow until 2014 Tax Bill is assessed per Escrow Agreement to

23

Texas American Title." This amount is identical to the escrow amount provided for in the EWA. The Church links Paragraph 13(A)'s procedures with this line item and both of those, in turn, with the EWA to limit the EWA's application to 2014 taxes only. The Church's position, in effect, is that the EWA is limited to effectuating Paragraph 13(A) alone. In fact, it argued in the trial court that: "The EWA merely addresses the escrow agent's required function of holding [the Church]'s prorated share of the current year's taxes and fees in escrow *as set forth in Paragraph 13A*." (Emphasis added.)

In sum, the Church concludes that the EWA "is easily harmonized with" Paragraph 13(B) because the EWA's reach is limited "to property taxes assessed for the year the sale of the Property occurred, 2014." According to the Church's briefing, the EWA obligated the Church "to pay its prorated share of any rollback taxes assessed *for 2014*" and, "in the event that the amount that the Church escrowed was insufficient to pay its five-month prorated share of the 2014 rollback taxes . . . , then the Church was obligated to pay the difference." (Emphasis in original.) Indeed, the Church's obligation to pay any amount in 2014 taxes imposed under Section 11.201(a) over the $23,149.38 escrowed is a necessary by-product of the Church's proposed harmonizing because the EWA, as noted above, says that "if there are additional amounts due" *for 2014*, which is the Church's proposed gloss, then "the seller will pay the additional monies."

24

We conclude that the Church's proposed harmonizing fails because it does not resolve fully the tension between Paragraph 13(B) and the EWA. It fails to do so because it would require a distinction between the taxes imposed under Section 11.201(a) for 2012 and 2013 on the one hand and those for 2014 on the other that the applicable statutory and contract language will not bear. For each of 2012, 2013, and 2014, the taxing authorities imposed the taxes because the "land [wa]s sold or otherwise transferred to another person in a year in which the land receive[d] an exemption under Section 11.20(a)(6) . . . ." TEX. TAX CODE § 11.201(a). There is no difference between what triggered the 2012 and 2013 taxes under Section 11.201(a) and what triggered the 2014 taxes—the same statutory language operated to trigger all three years' new taxes. We say "new" taxes because Section 11.201(a) describes its tax as "an additional tax imposed on the land." *Id.*

Because all three years' new taxes were triggered in the same way, and because none of them were pending at the time of closing but were only imposed by the taxing authorities afterwards, the 2012 taxes, the 2013 taxes, and the pre-June 2014 taxes were all "additional taxes . . . for periods prior to closing" resulting from "this sale." Therefore, they are all equally encompassed by Paragraph 13(B)'s terms.

25

Further, taxes imposed under Section 11.201(a) and subject to Paragraph 13(B) must be mutually exclusive of taxes subject to Paragraph 13(A) because the two paragraphs conflict in how they assign responsibility among the parties. If a Paragraph 13(A) tax remains unpaid, the Buyer must pay the remainder, but if a Paragraph 13(B) tax remains unpaid, either the Buyer or the Seller will be responsible for the remainder, depending on certain predicate events. Therefore, a tax imposed under Section 11.201(a), even if it is one for the "current year" in which the land sale takes place, cannot be governed by both Paragraph 13(A) and Paragraph 13(B). The result is that the EWA cannot be harmonized by linking it with the current-year-tax provisions from Paragraph 13(A). Both the EWA and Paragraph 13(B) govern "rollback" taxes resulting from "this sale." The taxes imposed under Section 11.201(a) for tax years 2012, 2013, and 2014 are all encompassed by those provisions' terms. And any tax imposed under Section 11.201(a) and governed by Paragraph 13(B) cannot also be governed by Paragraph 13(A).

Even if only the 2014 tax could be removed from Paragraph 13(B)'s ambit and put into Paragraph 13(A)'s, the Church's proposed harmonizing creates a new ambiguity. Paragraph 13(A) requires *the Buyer* to pay any unpaid current-year taxes, but the EWA—even if it is effectuating Paragraph 13(A)—still requires *the*

26

*Seller* to pay those amounts. Because the Church's proposed harmonizing leads to an ambiguity of its own, it cannot resolve this dispute.

As a result of rejecting the Church's proposed harmonizing, we conclude that the EWA obligates the Church to pay the taxes, while Paragraph 13(B) obligates TRG to pay them—an intractable conflict between the plain language of both provisions.[5]

## C.    Interpretive canons advanced by the parties

Neither interpreting the contract's plain language nor attempting to harmonize it as the Church argues for has resolved the dispute. We must therefore turn to the interpretive canons offered by the parties. *See G.T. Leach Builders*, 458 S.W.3d at 531–32.

The contract is potentially subject to both of two conflicting rules: (i) the rule that a later contract (here, potentially, the EWA) that "cannot subsist together" with a prior one (the Unimproved Property Contract) is presumed to supersede the prior one and (ii) the rule that, "[i]n harmonizing [contract] provisions, terms stated earlier in an agreement must be favored over subsequent terms." *Compare IP*

---

[5]    The Church also relies on a separate agreement executed by the parties, which provides that "additional or 'rollback' taxes owed" shall be paid "according to the agreement between Seller and Purchaser." Relying on this language begs the question. The "agreement" between the parties includes both Paragraph 13(B) and the EWA, not least because both parties ask us to interpret their contract as including both of those. This argument therefore does not advance the Church's position.

*Petrol.*, 116 S.W.3d at 899 (citing *Willeke*, 189 S.W.2d at 479) (former rule), *with Coker*, 650 S.W.2d at 393 (latter one); *Gallis*, 2017 WL 711737, at *16 (same); *and Kilgore Expl.*, 2015 WL 505275, at *7 (same). Because the parties do not advance either of these rules, we do not apply them here.

Next, TRG argues that the EWA is more specific to the topic of taxes imposed under Section 11.201(a) than Paragraph 13(B) is and that the EWA should therefore prevail. *See, e.g.*, *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994)). TRG asserts that the "EWA contained more specific terms regarding liability for rollback taxes than" Paragraph 13(B) does. But TRG does not offer any further analysis for why it contends that the EWA is more specific.

Under a plain-language reading of both provisions, both are equally as specific to the topic of taxes imposed under Section 11.201(a). Both provisions use similar names for the taxes—"Rollback Taxes" or "Tax Rollbacks." Paragraph 13(B)'s phrase "assessment of additional taxes . . . for periods prior to closing" is equally as encompassing of the taxes as are the EWA's phrases "amount[s] . . . for possible Tax Rollbacks" and "additional amounts due beyond the amount withheld." And both provisions are equally as excluding of other topics: "assessment of additional taxes for periods prior to closing" under Paragraph 13(B) is not materially more inclusive of topics beyond additional tax

28

liabilities than is "additional amount[] due beyond the amount withheld . . . to satisfy the amount due to the Tax assessor/collector" under the EWA. The specific-versus-general canon therefore does not resolve the dispute.

In its reply brief, TRG asks us to (i) apply the rule from *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.* that "changes in a printed form must be accorded special weight in construing the instrument"; (ii) construe the EWA as a change to the printed-form Unimproved Property Contract; and (iii) accordingly hold that the EWA supersedes Paragraph 13(B). *See* 352 S.W.3d 462, 472 & n.50 (Tex. 2011). However, the "changes in a printed form" that the Supreme Court interpreted in *Houston Exploration* were contract paragraphs physically lined through, which reflected the contracting parties' intent in self-evident ways that are absent here.

The Supreme Court was faced with interpreting a contract that was negotiated and entered into at Lloyd's of London, whose "age-old customs" are "unusual in American business law." *Id.* at 464 (quoting *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 929 (2d Cir. 1998) (citing GODFREY HODGSON, LLOYD'S OF LONDON 49–75 (1984))). The Court reviewed those customs because "surrounding circumstances that inform, rather than vary from or contradict, the contract text" can be inquired into when interpreting a contract as a matter of law. *See id.* at 469.

The parties had begun from a form WELCAR 2001 Offshore Construction Project Policy contract. They then "lin[ed] through" or "struck through" several provisions in the form, including one concerning "Stand-By Charges" that would have been relevant to the parties' later insurance-coverage dispute. *See id.* at 465–67. "As altered, the form became the policy to which" the parties "agreed." *Id.* at 467.

The negotiation setting, process, and strikethroughs were "crucial to understanding" the contract's terms:

> The parties did not create the policy text; rather, they began with a form policy that covered "all risks" of property damage, subject to a laundry list of terms that provided for reimbursement of different kinds of costs that might be incurred in connection with a covered loss. They did not edit the policy language, but they did strike through several provisions requiring payment of particular costs, including . . . weather stand-by charges. . . . The parties followed the customary process for negotiating an insurance policy in the London market.

*Id.* at 470. Therefore, though the insureds asked the Court to ignore the strikethroughs in the form, the Court could not do so. Ignoring the strikethroughs would "distort[] the negotiation process. The parties did not try to write a policy from scratch. They took an existing form, deleted some payment requirements and kept others. . . . To see the deletions as irrelevant blinks reality." *Id.*

The *Houston Exploration* strikethroughs therefore revealed the contracting parties' mutual intent in ways that TRG and the Church's adding the EWA to the Unimproved Property Contract does not. When the *Houston Exploration* parties

30

physically lined through text on their form, they were self-evidently embedding their joint intent in the text that remained unstruck. They were, for example, expressing the intent that the text that remained unstruck should not be interpreted as containing the content of the provisions that they lined through. *See id.* at 470 (rejecting insureds' contrary argument "that by deleting requirements that specific kinds of costs be reimbursed, the parties did not intend that the costs *not* be reimbursed" (emphasis in original)).

But when TRG and the Church added the EWA, they neither necessarily struck through Paragraph 13(B) nor struck through any of the EWA's terms. As the Church points out, the EWA does not mention Paragraph 13(B) or any other provision of the Unimproved Property Contract. More than this, we are without evidence in the record to conclude as a matter of law that the EWA is not itself a form. It includes fields to be filled in near the top of the page, much like other forms have. And the participation of the escrow agent as a party to the EWA, on his company's letterhead, may suggest use of a form as well. Finally, neither Paragraph 13(B) nor the EWA contain any lined-through text. *Houston Exploration* therefore does not resolve this dispute.

TRG's last argument relies on the parties' extracontractual conduct. It argues that we "must consider the parties' actions in connection with the transaction," including the Church's "deposit[ing] funds in escrow to pay the" taxes. The deposit

allegedly "evidences [the Church]'s understanding that it had the duty to pay any and all" of the taxes.

We are now in the realm of fact issues. We cannot affirm a grant of summary judgment based on inferences to be drawn from this evidence. *See Jones*, 746 S.W.2d at 896. Reasonable and fair-minded jurors could disagree about the inferences to be drawn from the Church's depositing the funds into escrow. *See Goodyear Tire & Rubber*, 236 S.W.3d at 755. For example, the Church's proposed harmonization of the EWA with Paragraph 13(B) depended upon its understanding that the EWA applied to only taxes imposed on the land after the sale for tax year 2014. Though we reject that matter-of-law interpretation of the contract, it does not necessarily follow that the Church's subjective belief in that interpretation was never genuine. It is therefore inappropriate to infer, as a matter of law, in the Church's escrow actions an intent to accept responsibility for all taxes imposed under Section 11.201(a) for all tax years. TRG's final argument does not support rendition of judgment in its favor.

\*        \*        \*

The result of our analysis is that this case must be remanded for further proceedings. The plain meanings of Paragraph 13(B) and the EWA conflict over whether the Buyer or the Seller is responsible for the taxes for tax years 2012 and 2013 imposed under Section 11.201(a). The interpretive canons advanced by the

32

parties do not resolve the conflict as a matter of law. This leaves an ambiguity in the contract that cannot be resolved on the record before us.[6] Accordingly, we sustain TRG's first issue only in part—we reverse the traditional and no-evidence summary judgment granted in the Church's favor on TRG's breach-of-contract cause of action, but we do not render judgment that the Church is liable for the taxes. This disposition requires that we overrule the Church's first issue, which sought only that we affirm the summary judgment on TRG's breach-of-contract cause of action.

TRG's live claims at summary judgment were its fifth amended petition's causes of action for breach of contract and *quantum meruit*. TRG's opening brief did not offer any reason, or citations to the record or to authorities, for why the summary judgment granted in the Church's favor on the *quantum meruit* claim should be reversed. And even after the Church pointed that out in its response brief, TRG's reply brief did not address *quantum meruit* either. We therefore must affirm the summary judgment as to this cause of action. *See* TEX. R. APP. P. 38.1(i); *Potter v. Clear Channel Outdoor, Inc.*, No. 01-07-00578-CV, 2009 WL

---

[6]   An ambiguity creates a fact issue as to the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *Reilly*, 727 S.W.2d at 529; *see generally* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business* PJC 101.37 (2018).

1886168, at *4 n.6 (Tex. App.—Houston [1st Dist.] July 2, 2009, no pet.) (mem. op.).

Also, because the Church is unequivocal that it "clearly abandoned its counterclaims," we affirm the summary judgment in TRG's favor on the Church's counterclaims.

Our disposition also requires that we reverse the summary judgment as to the parties' claims for attorneys' fees. TRG sought summary judgment for attorneys' fees under both the contract's "prevailing party" provision and Civil Practice and Remedies Code Section 38.001, and the Church sought summary judgment for fees only under the "prevailing party" provision. *See, e.g.*, *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011); *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

Because of our disposition, we cannot determine which party has prevailed. Neither party presented argument on the issue of which one has prevailed in the event of a reversal and remand. Also, because our disposition leaves TRG without a recovery on its contract cause of action, Civil Practice and Remedies Code Section 38.001 cannot support a rendition of attorneys' fees in its favor. *See Green Int'l*, 951 S.W.2d at 390. Our disposition therefore moots TRG's second issue— whether "a trial court may correctly decline to award attorneys' fees to either party

34

in a breach of contract case"—and the Church's second issue—"[w]hether the Church is entitled to attorney's fees . . . because [it] plainly prevailed on the main issue in the case." Both parties' claims for attorneys' fees should be decided anew in the trial court on remand.

## Conclusion

We affirm the summary judgment granted in the Church's favor on TRG's cause of action for *quantum meruit*. We affirm the summary judgment granted in TRG's favor on the Church's counterclaims. We reverse the remainder of the summary judgment in all respects. We remand the case for further proceedings consistent with this opinion.

Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.