**Opinion issued August 1, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

### NO. 01-16-00649-CV

———————————

**CASTILLO INFORMATION TECHNOLOGY SERVICES, LLC, Appellant**

**V.**

**DYONYX, L.P., Appellee**

---

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-35885**

---

### O P I N I O N

Appellant, Castillo Information Technology Services, LLC, sued appellee, Dyonyx, L.P., for breach of contract and promissory estoppel arising out of an agreement to provide telecommunications connectivity services. Both parties

moved for summary judgment, disputing whether the purchase order at issue was for a fixed five-year term or whether it could be terminated upon thirty days' written notice, as the parties' underlying consultant agreement provided. The trial court denied Castillo's summary judgment motion, granted Dyonyx's summary judgment motion, and dismissed Castillo's claims with prejudice. In one issue, Castillo contends that the trial court erred in its summary judgment rulings because the purchase order under which Castillo provided its services did not incorporate the thirty-day termination provision contained within the consultant agreement.

We affirm.

## Background

Castillo and Dyonyx are both information technology consulting firms located in the Houston area. In July 2014, Dyonyx entered into a contract with the City of Houston to provide various telecommunications services, including the installation of internet circuits and connections between data centers located in Austin and Bryan as well as additional services including system hosting and support.

On July 18, 2014, Dyonyx and Castillo entered into a Consultant Agreement, in which Dyonyx agreed "to retain the services of [Castillo] to assist it in discharging its obligations to its clients and to perform such other services as it may require from time to time." The Consultant Agreement provided that its term was post-dated to begin on July 8, 2014, and end on July 7, 2019, or five years later. The Consultant

Agreement provided that Dyonyx could terminate the agreement earlier in three situations: (1) Dyonyx could dismiss Castillo for "cause" upon written notice to Castillo; (2) Dyonyx could terminate the contract with or without cause upon thirty days' written notice to Castillo; or (3) Dyonyx could terminate the contract immediately upon written notice from Dyonyx's client, if Dyonyx's client terminated its contract with Dyonyx.

In the Consultant Agreement, Castillo agreed to "develop for the benefit of [Dyonyx] certain services on a project basis" during the contractual term. The Consultant Agreement provided: "The scope of each project or any other projects agreed upon by the parties shall be identified in a Purchase Order ("PO") and Statement of Work ("SOW")." Attached to the Consultant Agreement as Exhibit A was a "Statement of Work." The Statement of Work provided that Dyonyx's client was the City of Houston Public Works and Engineering Department, that the location of the assignment was Austin and Bryan, and that the services to be performed were telecommunications and connectivity services, with no labor required. The Statement of Work also provided that purchase orders would be issued on an annual basis, with the "base period" running from July 8, 2014, through July 7, 2015, and with "option periods" for each of the next four years, with the final option period ending July 7, 2019. The Statement of Work listed the "Firm Fixed

3

Price (Ceiling)" as $457,936.20, to be invoiced monthly in an amount of $7,632.27 over a sixty-month period.

On the same day the parties executed the Consultant Agreement, Dyonyx issued a Purchase Order to Castillo for a year's worth of services under Dyonyx's contract with the City of Houston, beginning July 8, 2014, and ending July 7, 2015. The Purchase Order stated the following under "Description of Item":

> Firm Fixed Price – Annual Fee for Telecommunications/Connectivity Services for a 1.5GB Ethernet Burstable 1.5 Gig Ethernet Internet Circuit for the Data Foundry Data Center in Austin and Ethernet Line 1 Gig connection between the Data Centers in Data Foundry (Austin) and Fibertown (Bryan) in support of the CoH Public Works and Engineering Dept. – Electronic Plan Review Project.

This description was identical to a description of Castillo's services to be provided to Dyonyx that was contained in the Statement of Work. The Purchase Order provided that a month's worth of services[1] cost $7,632.27, for a total of $91,587.24 for the year. The Purchase Order stated, "Total amount of this purchase order sets forth the entire payment required." Under "Justification," the Purchase Order stated:

> Under the Terms and Conditions of the fully executed Consultant Agreement #00603 between DYONYX and [Castillo]. This is a Firm Fixed Price 5 year contract, but DYONYX will issue annual PO(s)

---

[1] The summary judgment record included an affidavit from Talbot Theiss, Vice President of Strategic Accounts for Dyonyx, who averred that Castillo provided a "service, not a product" to Dyonyx. The Consultant Agreement and purchase order required Castillo to "provide data communication circuit services to [Dyonyx] on a monthly subscription basis. Those data communication services would then be used by [Dyonyx] to provide the City of Houston access to systems that were hosted by [Dyonyx]."

base[d] on the CoH PWE annual PO(s) issued against this project. This P.O. is not-to-exceed $91,587.24 for the period of performance stated above. There are no expenses required on this project.

The Purchase Order was signed by representatives of both Dyonyx and Castillo.

On November 7, 2014, four months after Dyonyx and Castillo entered into the Consultant Agreement and Dyonyx issued the Purchase Order to Castillo, the City of Houston informed Dyonyx that it was terminating the contract that it had with Dyonyx. The notice provided that, upon receipt, Dyonyx was to "discontinue all services in connection with" the performance of the contract and to cancel all existing purchase orders for services that Dyonyx had with vendors such as Castillo. On December 1, 2014, Dyonyx sent a written notice to Castillo informing it of the termination of the Purchase Order, effective December 31, 2014. In this notice, Dyonyx invoked the provision of the Consultant Agreement that allowed it to terminate the agreement with or without cause upon thirty days' written notice to Castillo.

Castillo subsequently sued Dyonyx for breach of contract and promissory estoppel. Castillo alleged that the Purchase Order issued by Dyonyx provided that the contract was a "Firm Fixed Price 5 year contract," and as a result, Dyonyx could not rely upon the thirty-day termination provision in the Consultant Agreement to terminate the Purchase Order after only four months. Castillo further alleged that, in reliance upon the Purchase Order, it had "entered into firm, fixed-price 5-year

5

contracts as necessary with its suppliers in order to meet [its] commitments to Dyonyx under the purchase order." Castillo alleged that Dyonyx had refused to make the monthly payments of $7,632.27 to Castillo after it terminated the contract, leaving a total of $427,407 owing to Castillo under the contract.

Castillo moved for traditional summary judgment on its claims against Dyonyx. Castillo argued that the Purchase Order provided for twelve monthly payments of $7,632.27 to Castillo, but the Purchase Order also stated that it was a "Firm Fixed Price 5 year contract" and that Dyonyx would issue yearly purchase orders to Castillo pursuant to its contract with the City of Houston. Castillo argued that nothing in the Purchase Order provided that it could be terminated on thirty-days' notice or that the Purchase Order was subject to the termination provisions contained in the Consultant Agreement. Castillo argued that, instead, the Purchase Order required Dyonyx to pay Castillo, regardless of whether the City of Houston terminated its contract with Dyonyx. In its summary judgment motion, Castillo also noted that although the third-party vendor it had retained to fulfill its contractual obligations had significantly discounted the invoice it submitted to Castillo after Dyonyx cancelled the Purchase Order, Castillo had still been required to pay its vendor $53,425.89, representing a full year's worth of services. Castillo thus argued that the trial court should render summary judgment in its favor and award it

6

$53,425.89 in damages and $16,517.66 in attorney's fees and costs, which it supported with an affidavit from its counsel.

Dyonyx also moved for summary judgment, arguing that Castillo could not prove that Dyonyx breached the Consultant Agreement. Dyonyx argued that the Consultant Agreement and the Purchase Order were not independent contracts but instead "expressly incorporate, integrate, and reference the other." The Consultant Agreement provided that Dyonyx would issue purchase orders to Castillo and that the scope of Castillo's required services would be set out in a purchase order or statement of work. The Statement of Work attached to the Consultant Agreement provided that Dyonyx would issue purchase orders on an annual basis. Dyonyx argued that the Purchase Order that it issued expressly referenced the Consultant Agreement and stated that it was issued under the terms and conditions of that agreement. Dyonyx thus argued that "the proper termination of the Consultant Agreement terminates any purchase orders issued under that Consultant Agreement," and it pointed out that the Consultant Agreement allowed it to terminate the contract upon thirty-days' written notice and that it was undisputed that Dyonyx had provided thirty days' written notice before terminating the contract. Dyonyx also argued that because the parties had entered into a valid contract—the Consultant Agreement—Castillo could not recover on its promissory estoppel claim.

7

The trial court denied Castillo's motion for summary judgment and granted Dyonyx's summary judgment motion, dismissing Castillo's claims against Dyonyx with prejudice. Castillo filed a motion for new trial, which was overruled by operation of law. This appeal followed.

**Summary Judgment**

In its sole issue, Castillo contends that the trial court erroneously granted summary judgment in favor of Dyonyx and denied its own summary judgment motion. Specifically, Castillo contends that the Purchase Order did not incorporate the thirty-day termination provision contained within the Consultant Agreement; instead, the Purchase Order provided that the contract term was for five years, and Dyonyx breached the Purchase Order when it cancelled the Purchase Order after only four months.

*A.     Standard of Review*

We review a trial court's ruling on a motion for summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence submitted by both parties and determine all questions presented. *Id.* We then render the judgment the trial court should have rendered. *Id.*

8

A party moving for traditional summary judgment bears the burden of demonstrating that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Fielding*, 289 S.W.3d at 848. When a plaintiff moves for summary judgment on its own claim, it must prove that it is entitled to judgment as a matter of law on each element of its cause of action. *Cleveland v. Taylor*, 397 S.W.3d 683, 696–97 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *G.C. Bldgs., Inc. v. RGS Contractors, Inc.*, 188 S.W.3d 739, 741–42 (Tex. App.—Dallas 2006, no pet.) (stating that if movant establishes right to judgment as matter of law, burden shifts to nonmovant to raise genuine issue of material fact or show movant's legal position is unsound).

## B.      *Interpretation of the Consultant Agreement and Purchase Order*

To prevail on a breach of contract claim, the plaintiff must establish (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *So. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

Contract language that can be given a certain or definite meaning is not ambiguous, and in that situation we construe the contract as a matter of law. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). In construing a written contract, our primary concern is to ascertain the true

intention of the parties as expressed in the contract. *N. Shore Energy v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (per curiam); *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). "We 'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Plains Expl. & Prod.*, 473 S.W.3d at 305 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). We consider the entire writing, harmonizing and giving effect to all of the contract provisions so that none of them will be rendered meaningless. *Id.*; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) ("When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement."). "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Plains Expl. & Prod.*, 473 S.W.3d at 305.

The Texas Supreme Court has held that "well-established law" provides that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968) ("[S]everal instruments may be read together when it

appears from their terms that they necessarily relate to the same transaction."); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) ("[A]greements executed at the same time, with the same purpose, and as part of the same transaction, are construed together."). In appropriate instances, courts may construe all of the documents "as if they were part of a single, unified instrument." *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840; *Gray & Co. Realtors, Inc. v. Atl. Hous. Found., Inc.*, 228 S.W.3d 431, 436 (Tex. App.—Dallas 2007, no pet.); *see also Halliburton Co. v. KBR, Inc.*, 446 S.W.3d 551, 564 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (noting, when construing master service agreement and tax sharing agreement together as one contract, that agreements were between same parties, were signed five days apart, and were "facets of the same transaction entered into for the unitary purpose of effectuating the corporate separation of KBR from Halliburton").

Here, the undisputed summary judgment evidence established that Dyonyx entered into a contract with the City of Houston to provide data circuits and connectivity services with respect to data centers in Austin and Bryan. To perform its contractual obligations with the City of Houston, Dyonyx then entered into the Consultant Agreement with Castillo. This Agreement stated that Dynoyx "deems it advisable to retain the services of [Castillo] to assist it in discharging its obligations to its clients and to perform such other services as it may require from time to time."

The parties agreed that the contract term would begin on July 8, 2014, and would end on July 7, 2019, although the parties also agreed that Dyonyx could terminate the Consultant Agreement early for cause, with or without cause upon thirty days' written notice, or immediately if Dyonyx's client terminated its contract with Dyonyx. The parties also agreed that, during the contract term, Castillo would "develop for the benefit of [Dyonyx] certain services on a project basis" and that "[t]he scope of each project or any other projects agreed upon by the parties shall be identified in a Purchase Order ("PO") and Statement of Work ("SOW")." The parties executed this Agreement on July 18, 2014.

It is also undisputed that Exhibit A to the Consultant Agreement, entitled "Statement of Work," set out specific information related to the parties' contractual obligations. The Statement of Work identified Dyonyx's client as the City of Houston Public Works and Engineering Department, provided that the assignment would be located in Austin and Bryan, described the services to be performed as "Telecommunications/Connectivity Services/No Labor," and specifically stated that Castillo would be responsible for providing data circuits and an Ethernet connection between Austin and Bryan. The Statement of Work also provided that purchase orders "will be issued on an annual basis" and that the "base period" of the contract was from July 8, 2014, through July 7, 2015, with "option period[s]" for each of the next four years, through July 7, 2019. The Statement of Work further provided a

"Firm Fixed Price (Ceiling)" of $457,936.20, to be invoiced monthly in the amount of $7,632.27 over a sixty-month period.

The same day that the parties entered into the Consultant Agreement, Dyonyx issued the Purchase Order to Castillo. The Purchase Order described the subject of the order as:

> Firm Fixed Price – Annual Fee for Telecommunications/Connectivity Services for a 1.5GB Ethernet Burstable 1.5 Gig Ethernet Internet Circuit for the Data Foundry Data Center in Austin, and Ethernet Line 1 Gig connection between the Data Centers in Data Foundry (Austin) and Fibertown (Bryan) in support of the CoH Public Works and Engineering Dept. – Electronic Plan Review Project.

The Purchase Order stated that the monthly cost of the services was $7,632.27, for a total cost of $91,587.24 for the year. The Purchase Order listed the "Period of Performance" as July 8, 2014, through July 7, 2015, and stated that the "[t]otal amount of this purchase order sets for the entire payment required." Under "Justification," the Purchase Order provided:

> Under the Terms and Conditions of the fully executed Consultant Agreement #00603 between DYONYX and [Castillo]. This is a Firm Fixed Price 5 year contract, but Dyonyx will issue annual PO(s) base[d] on the CoH PWE annual PO(s) issued against this project. This P.O. is not-to-exceed $91,587.24 for the period of performance stated above. There are no expenses required on this project.

Castillo's president signed the Purchase Order on July 21, 2014.

It is further undisputed that the City of Houston informed Dyonyx that it was terminating their contract in November 2014. Dyonyx then informed Castillo on

13

December 1, 2014, that, effective December 31, 2014, it was terminating the Consultant Agreement and the Purchase Order.

In arguing that Dyonyx breached the parties' contract, Castillo cites several cases for the proposition that the language in the "Justification" section of the Purchase Order—"Under the Terms and Conditions of the fully executed Consultant Agreement #00603 between DYONYX and [Castillo]"—was not sufficiently specific to incorporate the terms of the Consultant Agreement by reference into the Purchase Order, specifically, the provisions in the Consultant Agreement allowing Dyonyx to terminate the Agreement before the five-year term expired. *See Owens*, 433 S.W.2d at 167; *Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.); *In re C & H News Co.*, 133 S.W.3d 642, 645 (Tex. App.—Corpus Christi 2003, orig. proceeding); *Trico Marine Servs., Inc. v. Stewart & Stevenson Tech. Servs., Inc.*, 73 S.W.3d 545, 549–50 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding [mand. denied]); *Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207, 211–12 (Tex. App.—San Antonio 1998, no writ); *MTrust Corp. N.A. v. LJH Corp.*, 837 S.W.2d 250, 253–54 (Tex. App.—Fort Worth 1992, writ denied); *see also Valero Mktg. & Supply Co. v. Baldwin Contracting Co.*, No. H-09-2957, 2010 WL 1068105, at *1–5 (S.D. Tex. Mar. 19, 2010).

Each of these cases stands for the proposition that a signed contract may incorporate an unsigned document by reference, but to do so, the contract must refer to the unsigned document with sufficient specificity. *See, e.g.*, *Bob Montgomery Chevrolet*, 409 S.W.3d at 189 (holding that unsigned document may be incorporated by reference into signed contract by referring to unsigned document in contract, but "[p]lainly referring to a document requires more than merely mentioning the document"); *Trico Marine Servs.*, 73 S.W.3d at 549–50.

In *Owens*, for example, the Texas Supreme Court addressed whether a letter written by a seller of real estate, but which did not contain enough information to sufficiently describe the land, incorporated by reference an earlier letter that did describe the land written by a real estate broker inquiring about the sale. *See* 433 S.W.2d at 166. The court recognized that "[i]t is uniformly held that an unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged" and further stated that "[t]he language used is not important provided the document signed by the defendant plainly refers to another writing." *Id.* The court noted that when the letter from the broker and the letter from the seller were read together, it appeared that the letter written by the seller was in reply to the earlier letter from the broker. *Id.* at 167. The court stated, however, that although the two letters "obviously relate to the same subject matter," there was nothing in the letter by the seller—the defendant and the party "sought to be charged"—"that even

15

remotely suggests the existence of another writing." *Id.* The court concluded that because the contents of the seller's letter did not demonstrate that it was "based on an adoption of the letter written by [the broker]," the seller's letter did not incorporate the broker's letter by reference. *Id.*

In *Bob Montgomery Chevrolet*, the signed contract allowed an automobile dealership to become a "certified repair center" for a company that provided a dent repair service. 409 S.W.3d at 184. The contract referred to a document on the company's website that contained information about a special service program. *Id.* at 185. This document, not signed by the dealership, also contained a forum selection clause. *Id.* In subsequent litigation, the company sought to enforce the forum selection clause against the dealership, arguing that the signed contract, which mentioned the Internet document containing the forum selection clause, incorporated that document by reference. *Id.* at 188–89. The Dallas Court of Appeals disagreed, reasoning that the contract language mentioning the website did not state that the document was incorporated by reference into the contract, did not "plainly refer to additional terms and conditions in the internet document as becoming part of the parties' agreement," and did not "otherwise suggest that the parties intended for the internet document to become part of their agreement." *Id.* at 190; *see also In re C & H News*, 133 S.W.3d at 646 (holding that arbitration agreement allowing "arbitration as provided in the [Employee] Handbook" incorporated by reference

16

provisions in unsigned employee handbook relating to arbitration); *Trico Marine Servs.*, 73 S.W.3d at 549–50 (holding that signed contract did not incorporate unsigned document entitled "General Terms and Conditions of Sale" by reference when contract merely mentioned unsigned document in table of contents and again as heading of section of contract); *Castroville Airport*, 974 S.W.2d at 211 (holding that signed Settlement Memorandum incorporated by reference two unsigned exhibits because Memorandum "plainly referred" to exhibits); *MTrust Corp.*, 837 S.W.2d at 253–54 (holding that signed contract to purchase real estate incorporated by reference unsigned exhibit consisting of maps of property when contract stated "'Exhibit B' attached hereto and incorporated herein by reference for all purposes"); *see also Valero Mktg. & Supply*, 2010 WL 1068105, at *4–5 (holding that signed contract to purchase asphalt, which included provision that "[a]ll prices quoted above are subject to Valero's General Terms and Conditions for Petroleum Product Purchases/Sales," incorporated unsigned "General Terms" document, which was available on Valero's website, by reference for limited purpose of governing quoted prices but did not incorporate forum selection clause contained within "General Terms" document).

Unlike the cases cited by Castillo, this case does not involve a party attempting to incorporate by reference an unsigned document into a signed contract. Instead, this case involves two documents—the Consultant Agreement and the Purchase

17

Order—both of which were signed by representatives of both Castillo and Dyonyx, and both of which reference each other and relate to the same transaction. We conclude that *Owens* and its progeny are inapposite.

The Consultant Agreement, signed by both Castillo and Dyonyx, expressly contemplated the issuance of a purchase order that, along with a "Statement of Work," would set out the scope of services that Castillo was to perform pursuant to the Agreement. The Purchase Order, issued and signed by Dyonyx on the same day the parties executed the Consultant Agreement and signed by Castillo three days later, stated that it was issued under the parties' Consultant Agreement. The description of services in the Purchase Order mirrors the language of the Statement of Work attached to the Consultant Agreement. These two documents were executed near the same time, the documents involve the same purpose, and the documents clearly pertain to the same transaction. We therefore must construe these documents together. *See In re Prudential*, 148 S.W.3d at 145; *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840; *Halliburton*, 446 S.W.3d at 564.

Castillo argues that we cannot construe the Purchase Order "to incorporate a 30-day termination provision without rendering the terms 'firm,' '5-year-contract,' and 'payment required' meaningless." However, focusing solely on the statement in the Purchase Order that "[t]his is a Firm Fixed Price 5 year contract" in isolation, as Castillo would have us do, would render meaningless the early termination

18

provisions in the Consultant Agreement, which must be read with the Purchase Order, as well as the provisions in the Statement of Work setting out the schedule of performance with a "base period" of one year followed by four one-year "option period[s]."

The Consultant Agreement provided that it would be in effect for five years, beginning on July 8, 2014, and ending July 7, 2019, but it also designated three situations in which Dyonyx could terminate the Agreement earlier: (1) for cause; (2) with or without cause upon thirty days' written notice; or (3) "[i]mmediately upon written notice from DYONYX's Client, should the Client terminate its contract with DYONYX." The Consultant Agreement also provided that throughout the contract term Castillo would provide services to Dynoyx, the scope of which would be set out in a purchase order and a Statement of Work. The Statement of Work, attached to the Consultant Agreement as Exhibit A, stated that Dyonyx would issue purchase orders on an annual basis and that the "base period" would be from July 8, 2014, through July 7, 2015. The Statement of Work described each of the next four years after that, from July 8, 2015, through, ultimately, July 7, 2019, as "option period[s]." The Statement of Work also stated a price of $7,632.27 per month over a sixty-month period, for a total "ceiling" contract price of $457,936.20. Thus, the Statement of Work set the monthly price Dyonyx would pay for Castillo's services, set out a maximum contract term of five years if each of the four "option period[s]"

was exercised, and stated the maximum amount Castillo would be paid if it ultimately provided services for the full five years.

The Purchase Order, issued the same day as the Consultant Agreement and its attached Statement of Work, mirrored the Statement of Work's description of the services Castillo was to provide and stated that the monthly cost of the services to be paid to Castillo was $7,632.27. The Purchase Order stated that the period of performance was from July 8, 2014, through July 7, 2015, or for one year, and provided that the "[t]otal amount of this purchase order," or $91,587.24, "sets forth the entire payment required." The Purchase Order also stated, "This is a Firm Fixed Price 5 year contract, but DYONYX will issue annual PO(s) [purchase orders] base[d] on the CoH PWE annual PO(s) [i]ssued against this project." Thus, the Purchase Order stated that the parties had a five-year contract, consistent with the Consultant Agreement; it stated that the price for Castillo's services was $7,632.27 per month, consistent with the Statement of Work; and it stated that Dyonyx would issue purchase orders on an annual basis pursuant to purchase orders issued by its client, the City of Houston, also consistent with the Statement of Work.

Reading these documents together, as we must, we conclude that the parties intended to enter into an agreement consisting of a Consultant Agreement, a Statement of Work, and a Purchase Order whereby Castillo would provide services to Dyonyx for a maximum of five years. *See Plains Expl. & Prod.*, 473 S.W.3d at

20

305 (stating that when construing contract, we consider entire writing, harmonizing and giving effect to all contract provisions so that none will be rendered meaningless). However, the parties agreed in the Consultant Agreement that Dyonyx could terminate that Agreement with or without cause upon thirty days' written notice or immediately if Dyonyx's client, defined in the Statement of Work as the City of Houston, terminated its contract with Dyonyx. Thus, if Dyonyx properly terminated the Consultant Agreement pursuant to its terms, the Purchase Order issued pursuant to the Consultant Agreement also terminated without constituting a breach of the contract between the parties. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840 (holding that instruments pertaining to same transaction may be read together to ascertain parties' intent and that courts may construe documents "as if they were part of a single, unified instrument"). Because it is undisputed that Dyonyx, after being informed by the City of Houston that the City was terminating its contract with Dyonyx, provided thirty days' written notice to Castillo that the Consultant Agreement would terminate, we conclude that Dyonyx conclusively established that it did not breach its contract with Castillo. We therefore hold that the trial court did not err by granting Dyonyx's summary judgment motion and denying Castillo's motion.

We overrule Castillo's sole issue.

21

## Conclusion

We affirm the judgment of the trial court.


        Evelyn V. Keyes
        Justice

Panel consists of Chief Justice Radack and Justices Keyes and Massengale.