**Opinion issued September 21, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00852-CV

————————————

**NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA., Appellant**

**V.**

**EXXON MOBIL CORPORATION AND STARR INDEMNITY &
LIABILITY INSURANCE COMPANY, Appellees**

*and*

**EXXON MOBIL CORPORATION, Appellant**

**V.**

**STARR INDEMNITY & LIABILITY INSURANCE COMPANY, Appellee**

On Appeal from the 125th District Court
Harris County, Texas
Trial Court Case No. 2014-22667

**MEMORANDUM OPINION**

This case involves two related appeals. In the first appeal, appellant, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), challenges the trial court's rendition of summary judgment in favor of appellee, Exxon Mobil Corporation ("Exxon"), and appellee, Starr Indemnity and Liability Insurance Company ("Starr"), in Exxon's suit against National Union and Starr for breach of contract and a declaratory judgment. In four issues, National Union contends that the trial court erred in denying its summary-judgment motion and in granting Exxon and Starr summary judgment.

In the second appeal, appellant, Exxon, challenges the trial court's rendition of summary judgment in favor of appellee, Starr, in Exxon's suit against Starr for breach of contract and a declaratory judgment. In four issues, Exxon contends that the trial court erred in denying its summary-judgment motion and granting Starr summary judgment.

We reverse and render in part and affirm in part.

**Background**

In its fourth amended petition, Exxon alleged that in January 2013, Kevin Roberts and Arturo Munoz, two employees of Savage Refinery Services, LLC ("Savage"), were providing services under Standard Procurement Agreement

2

No. 2088773 (the "Exxon-Savage Contract")[1] at Exxon's Baytown, Texas Refinery.

Under the Exxon-Savage Contract, Savage provided certain services at Exxon's

Baytown Refinery. Exxon drafted the Exxon-Savage Contract, which required,

among other things, that Savage obtain certain insurance coverage for Exxon as an

additional insured, as follows:

> 14. Insurance.
>
> (a) Coverages. [Savage] shall carry and maintain in force at least the following insurance and amounts: . . . (2) its normal and customary Commercial General Liability insurance coverage and policy limits or at least $2,000,000, whichever is greater, providing coverage for injury, death or property damages resulting from each occurrence . . . . Notwithstanding any provision of an Order to the contrary, [Savage's] liability insurance polic(ies) described above shall: (i) cover [Exxon] and Affiliates as additional insureds in connection with the performance of Services . . . .

Savage, through its brokers and agents, issued certificates of liability insurance

representing that it maintained the liability coverages it had assumed liability to

provide under the Exxon-Savage Contract.[2]

According to Exxon, on January 12, 2013, Roberts and Munoz were "bolting

and unbolting flanges on piping to coker drums . . . when hot water and steam exited

---

[1]     Exxon attached a copy of the Exxon-Savage Contract to its fourth amended petition. The Exxon-Savage Contract was entered into by Savage's predecessor-in-interest, Marsulex Refinery Services, LLC, and Exxon in June 2007.

[2]     Exxon attached copies of the certificates of liability insurance to its fourth amended petition.

a flange on piping" on one of the drums, "causing injury to Roberts and Munoz." Roberts brought a personal-injury suit against Exxon (the "*Roberts* litigation"),[3] and Munoz made an out-of-court claim against Exxon for his injuries (the "Munoz claim"). Exxon made a demand on "all of Savage's liability insurance carriers, including . . . Starr and National Union for recognition of [its] additional insured status[,] for coverage" in the *Roberts* litigation, and for "defense and indemnity against the bodily injury claims asserted by both" Roberts and Munoz. Specifically, Exxon made demands on the following policies issued to Savage as the named insured:

- AIG Europe Limited, formerly known as Chartis Europe Limited ("AIG Europe Limited"), Liability Policy No. CU001150b (the "AIG Policy");

- National Union Liability Policy No. 9725090 (the "National Union Commercial General Liability (CGL) Policy");

- Starr Liability Policy No. MASILSE 00005012 (the "Starr Bumbershoot Policy");

- National Union Liability Policy No. 13273101 (the "National Union Umbrella Policy"); and

- National Union Liability Policy No. 051769615 (the "other National Union Policy").

---

[3] *See Kevin Roberts v. ExxonMobil Corp.*, No. 2013-03033 (165th Dist. Ct., Harris County, Tex. May 11, 2015).

In response, "AIG Europe Limited fully recognized" Exxon's status as an "additional insured and provided coverage under its policy to [Exxon]" in the *Roberts* litigation, "including defense and indemnity . . . up to its policy limit," but that amount "was insufficient to meet" Exxon's obligations under the Exxon-Savage Contract. According to Exxon, though, "Starr and National Union . . . each wrongfully disclaimed and denied [their] obligation[s] for such coverage, defense, or indemnification against claims asserted by Roberts [and] Munoz . . . against [Exxon]." Exxon asserted that the policies issued by Starr and National Union nevertheless "unambiguously require[d] Starr and National Union to defend and indemnify" Exxon for the claims asserted by Roberts and Munoz. And alternatively, "th[os]e policies [were] ambiguous and must be construed in favor of coverage for [Exxon]." In either event, Starr and National Union wrongfully denied coverage, leaving Exxon "to fend for itself against the bodily injury claims asserted by" Roberts and Munoz and causing Exxon to incur attorney's fees and defense costs. And "Starr and National Union wrongfully disclaimed their contractual obligations for coverage including indemnification on behalf of [Exxon] as an additional insured on their policies and refused to negotiate settlement[s] in good faith on behalf of [Exxon]."

Exxon brought breach of contract claims against Starr and National Union[4] based on their failure to comply with their purported contractual "dut[ies] to indemnify and protect [Exxon] against the bodily injury claims asserted by Roberts and Munoz," and their wrongful denial of coverage, "including indemnification against the Roberts and Munoz bodily injury claims." And it alleged that as a proximate result of the breaches of contract by Starr and National Union, Exxon was "damaged in an amount in excess of the minimum jurisdictional limits of the [trial] [c]ourt" and incurred attorney's fees and costs, which it sought to recover pursuant to Texas Civil Practice and Remedies Code section 38.001(b)(8).

Exxon also sought a declaration of "the rights, status and other legal relations as between [Exxon] and [Starr and National Union] under the contracts, liability insurance policies with respect to additional insured status, coverage and indemnity of [Exxon] against the bodily injury claims of Roberts and Munoz." Specifically, Exxon sought declarations that it was "an additional insured under the liability policies in question"; that "[b]odily injury claims asserted against [Exxon] by Roberts and Munoz . . . [were] covered under the provisions of the policies issued by . . . Starr and National Union"; that "Starr and National Union owe[d] and ha[d]

---

[4]     Exxon also brought a breach of contract claim against The Insurance Company of The State of Pennsylvania, but, that party entered a stipulation with Exxon, which then dismissed without prejudice all of its claims against The Insurance Company of The State of Pennsylvania.

owed coverage including a duty to defend and duty to indemnify [Exxon] against the bodily injury claims asserted by Roberts and Munoz"; and that "Starr and National Union ha[d] not timely acknowledged [Exxon]'s additional insured status, correct priority of coverage, or otherwise provided coverage for defense and indemnity against the bodily injury claims of Roberts and Munoz . . . and [were] consequently liable to [Exxon] for interest damages under Texas Insurance Code, Chapter 542, subchapter b." Exxon requested attorney's fees and costs under the Uniform Declaratory Judgments Act (the "DJA").[5]

National Union answered, generally denying the allegations in Exxon's petition, asserting the affirmative defenses of estoppel and waiver, and specifically asserting that the National Union CGL Policy and the AIG Policy "ha[d] satisfied any and all obligations—to the extent there were any—to Exxon" and that "th[o]se policies provide[d] no coverage, or further coverage, to Exxon." National Union also denied that Exxon was "an additional insured under [the National Union Umbrella Policy]" and asserted that "the [National Union] Umbrella Policy otherwise provide[d] no coverage to Exxon." Alternatively, National Union maintained that "the [National Union CGL Policy], the Starr Bumbershoot Policy, and/or other policy(ies) must [have] be[en] exhausted before the [National Union]

---

[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Any other claims that Exxon brought against National Union and Starr were later dismissed without prejudice by the trial court pursuant to the parties' stipulation.

Umbrella Policy would even [have] be[en] triggered for any potential coverage (although there [was] no coverage for Exxon under the [National Union] Umbrella Policy)."

Starr answered, generally denying the allegations in Exxon's petition and explaining that:

> Savage's liability insurance program was structured with two distinct "towers" of insurance: (1) a marine tower that consist[ed] of the Hull & Machinery policies, Protection & Indemnity policies, Vessel Pollution policies, and the Marine General Liability/Terminal Operators Liability/Charterer's Legal Liability policy as the base, with [the] Starr[] . . . Bumbershoot [P]olicy above that, and (2) a non-marine tower that start[ed] with the $4,500,000 National Union [CGL] [P]olicy and [went] up through the National Union Umbrella [P]olicy. The Refinery Exclusion Clause was inserted in the Marine General Liability/Terminal Operators Liability/Charterer's Legal Liability policy to exclude coverage under that policy and the other policies in the marine tower for refinery activities that were unrelated to the handling of refinery by-products for marine transportation.

As a result, Starr asserted that Exxon's claims "should [have] be[en] covered under the non-marine tower of insurance rather than the marine tower" topped by the Starr Bumbershoot Policy. And Starr maintained that the Exxon-Savage Contract "unambiguously d[id] not require Exxon to be named as an additional assured on any of Savage's marine policies" and, "if any ambiguity exist[ed] as to whether" the reference to "'Commercial General Liability insurance' mean[t] anything other than a primary Commercial General Liability insurance policy, [it] should be construed against Exxon as the drafter of the language in question."

8

In regard to their disputes, Exxon, National Union, and Starr entered certain stipulations, including, pertinent to this appeal, the following:

- "At the time of the accident in question, [Savage] was performing services for Exxon pursuant to [the Exxon-Savage Contract]."

- "Roberts and Munoz received bodily injuries at the [Exxon] Baytown Refinery Delayed Coker Unit as a result of a discharge of hot water and steam on or about January 12, 2013."

- "Roberts filed a lawsuit against Exxon . . . ."

- "Munoz and his wife . . . demanded payment from Exxon for the bodily injuries to Munoz and the claims of his wife . . . but did not file a lawsuit against Exxon . . . ."

- "[The AIG Policy] provided a defense for Exxon" in the *Roberts* litigation.

- "Exxon received $177,134.45 in attorney['s] fees and costs paid to Exxon's counsel" for its defense in the *Roberts* litigation "and for Exxon['s] counsel's work regarding the Munoz [c]laim from either [the AIG Policy] or [the other National Union Policy]."

- "Exxon settled the *Roberts* [litigation] for $12,000,000 and said amount was paid."

- "Either AIG Europe Limited . . . , under [the AIG Policy], or National Union, under [the other National Union Policy], paid $822,865.55 of the $12,000,000 settlement of the *Roberts* [litigation]."

- "National Union, under [the National Union CGL Policy], paid $1,676,570.16 of the $12,000,000 settlement of the *Roberts* [litigation] . . . ."

- "Exxon paid with its own funds $9,510,564.29 of the $12,000,000 settlement of the *Roberts* [litigation] and seeks recovery of that amount in this lawsuit."

9

- "Exxon settled the Munoz claim for $12,443,000 and such amount was paid . . . ."

- "National Union, under [the National Union CGL Policy], paid $1,866,450.00 of the $12,443,000 settlement of the Munoz [c]laim."

- "Exxon paid with its own funds $10,576,550.00 of the $12,443,000 settlement of the Munoz [c]laim and seeks recovery of that amount in this lawsuit."

- "To date, [the Starr Bumbershoot Policy] has not paid any amounts to or on behalf of Exxon for the *Roberts* [litigation] or the Munoz [c]laim and has denied coverage for said claims."

- "To date, [the National Union Umbrella Policy] has not paid any amounts to or on behalf of Exxon for the *Roberts* [litigation] or the Munoz [c]laim and has denied coverage for said claims."

- "Either [the AIG Policy] or [the other National Union Policy] has exhausted a $1,000,000 policy limit in payment of defense costs for, and towards settlement of, the *Roberts* [litigation] by Exxon."

- "Exxon drafted Paragraph 14 of the [Exxon-Savage Contract]."

On these stipulated facts, Exxon, National Union, and Starr filed competing motions for summary judgment against one another. In its matter-of-law summary-judgment motion, Exxon argued that it was entitled to judgment as a matter of law on its breach of contract and declaratory judgment claims because it was entitled to coverage under the National Union Umbrella Policy and the Starr Bumbershoot Policy for the $20,087,114.29 it paid to settle the *Roberts* litigation and the Munoz claim. With regard to National Union, Exxon argued that it was an "insured under the unambiguous language of [the National Union Umbrella Policy]"

10

"because any organization insured by the National Union primary general liability policy [was] also insured under the [National Union] Umbrella Policy." And the Exxon-Savage Contract, "which [the National Union Umbrella Policy] d[id] not incorporate," should not be considered in interpreting the National Union Umbrella Policy and "c[ould not] alter Exxon's insured status under the [National Union] Umbrella Policy." Thus, although the National Union Umbrella Policy definition that "insureds" include "any person or organization . . . included as an additional insured under Scheduled Underlying Insurance, but not for broader coverage than would be afforded by such Scheduled Underlying Insurance," Exxon maintained, it did not exclude Exxon from coverage. Exxon also asserted that it was not required to erode or exhaust Starr's Bumbershoot Policy before seeking coverage from National Union under the National Union Umbrella Policy.

With regard to Starr, Exxon argued that it was covered as "an '[a]ssured' under the [Starr] Bumbershoot Policy," because that policy "include[d] as an assured any party for whom Savage [was] obligated by contract to provide insurance coverage, and Savage [was] obligated" under the Exxon-Savage Contract "to cover Exxon[] as an additional insured on its normal and customary '[c]ommercial [g]eneral [l]iability insurance coverage.'" And Exxon asserted that the "[Starr] Bumbershoot Policy provide[d] '[c]ommercial [g]eneral [l]iability insurance coverage,' as required by the [Exxon-Savage Contract]."

11

National Union filed a combined no-evidence and matter-of-law summary-judgment motion against Exxon on Exxon's breach of contract and declaratory judgment claims and a matter-of-law summary-judgment motion against Starr. National Union argued that it was entitled to judgment as a matter of law on Exxon's breach of contract and declaratory judgment claims because its reimbursements to Exxon exhausted limits under the National Union CGL Policy, which fully discharged its obligation to Exxon. And it argued that Exxon was not an additional insured under all of National Union's policies because the Exxon-Savage Contract "expressly limit[ed] additional insured coverage for Exxon to insured Commercial General Liability coverage." Further, the National Union Umbrella Policy "incorporate[d] the coverage limitations" of the National Union CGL Policy by including as an "'[i]nsured' any organization included as an additional insured under the [National Union CGL Policy] but not for broader coverage than would be afforded by [the National Union CGL Policy]." As to its no-evidence summary-judgment motion, National Union asserted that Exxon "failed to raise a genuine issue of material fact demonstrating that National Union breached the terms of a valid contract."

Alternatively, National Union, in its matter-of-law summary-judgment motion against Starr, asserted that if the trial court found "that the additional insured provision in the [Exxon-Savage Contract] contemplated additional insured status for

12

Exxon beyond primary level Commercial General Liability Insurance, then Exxon [was] an additional insured under the [Starr Bumbershoot Policy]," and the Starr Bumbershoot Policy "must be exhausted before implicating or triggering the National Union Umbrella Policy." And National Union sought a declaration that the "National Union Umbrella Policy [was] excess to the [Starr Bumbershoot Policy] and the [Starr Bumbershoot Policy] provide[d] coverage to Exxon as an additional insured that must be exhausted before implication of the National Union Umbrella Policy."

In its combined response to National Union's summary-judgment motion and cross-matter-of-law summary-judgment motion against National Union, Starr argued that National Union was not entitled to summary judgment as a matter of law against it, but it was entitled to summary judgment against National Union, because the incident that gave rise to the *Roberts* litigation and the Munoz claim had "nothing to do with Savage's marine operations" and was not covered by the Starr Bumbershoot Policy as a "bumbershoot policy is a type of umbrella coverage designed specifically to insure marine risks." (Internal quotations omitted.)

In its combined response to Exxon's summary-judgment motion and cross-matter-of-law summary-judgment motion against Exxon, Starr argued that Exxon was not entitled to summary judgment as a matter of law on its breach of contract and declaratory judgment claims against Starr, but Starr was entitled to

summary judgment on Exxon's breach of contract and declaratory judgment claims because the Exxon-Savage Contract "did not require Exxon to be named as an additional insured on the Starr Bumbershoot Policy" because the Starr Bumbershoot Policy was not a "Commercial General Liability policy." (Internal quotations omitted.)

In interlocutory orders, the trial court granted Starr's summary-judgment motion against National Union and denied National Union's summary-judgment motion against Starr. It also granted Starr's summary-judgment motion against Exxon and denied Exxon's summary-judgment motion against Starr. And the trial court granted Exxon's summary-judgment motion against National Union and denied National Union's summary-judgment motion against Exxon. In granting Exxon's summary judgment motion against National Union on Exxon's breach of contract and declaratory judgment claims, the trial court declared: "National Union . . . is liable to Exxon . . . for $20,087,144.29 under the [National Union] Umbrella Policy in connection with the settlement of the *Roberts* [litigation] and the Munoz [c]laim." (Emphasis added.)

After these rulings, Exxon filed another summary-judgment motion to recover pre-judgment interest and the attorney's fees incurred in prosecuting its claim

against National Union under the DJA[6] and Texas Civil Practice and Remedies Code section 38.001(b)(8).[7] National Union responded in opposition and objected to Exxon's evidence attached to its motion.

On October 1, 2019, the trial court signed the final judgment, which awarded Exxon the following relief against National Union:

1) Monetary relief of $20,087,114.29, of which $9,510,564.29 had been paid to resolve the *Roberts* litigation and $10,576,550 had been paid to resolve the Munoz claim;

2) Attorney's fees and expenses of $41,236.70 incurred in resolving the Munoz claim;

3) Attorney's fees and expenses of $681,948.73 incurred in prosecuting and defending causes of action related to the claims against The Insurance Company of The State of Pennsylvania;

4) Attorney's fees and expenses of $1,177,848.80 incurred in prosecuting this coverage dispute against National Union;

5) Conditional appellate attorney's fees of $400,000;

6) Pre-judgment interest on these amounts accruing at a rate of 5.5% from the filing of the lawsuit until the date the final judgment was signed; and

7) Post-judgment interest accruing at a rate of 5.5% after the date the final judgment was signed.

---

[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

[7] *See id.* § 38.001(b)(8).

## Standard of Review

We review a trial court's decision on summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Although the denial of a summary-judgment motion is normally not appealable, we may review such a denial when both parties have moved for summary judgment and the trial court grants one motion and denies the other. *Id.*

On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278–79 (Tex. 2018); *Fallon v. Univ. of Tex. MD Anderson Cancer Ctr.*, 586 S.W.3d 37, 46 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In our review of such cross-motions, we examine the summary-judgment evidence presented by each party, determine all issues presented, and render the judgment that the trial court should have rendered. *Tarr*, 556 S.W.3d at 278–79; *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004). If we determine that a fact issue precludes summary judgment for either party, we remand the cause for trial. *See Univ. of Tex. Health Sci. Ctr. at Houston v. Big Train Carpet of El Campo, Inc.*, 739 S.W.2d 792, 792 (Tex. 1987).

To prevail on a matter-of-law summary-judgment motion, a movant has the burden of establishing that there is no genuine issue of material fact and it is entitled

to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a plaintiff moves for summary judgment on its own claim, it must conclusively prove all essential elements of its cause of action. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341; *Fallon*, 586 S.W.3d at 46. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in the non-movant's favor. *Id.* at 549.

## National Union's Appeal

In its first issue, National Union argues that the trial court erred in granting summary judgment in favor of Exxon and denying National Union's summary-judgment motion against Exxon on Exxon's breach of contract and declaratory judgment claims because the National Union Umbrella Policy did not provide, and the Exxon-Savage Contract did not require, coverage beyond that available under the National Union CGL Policy.

17

The ordinary rules of contract interpretation apply to insurance policies. *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257–58 (Tex. 2017). We apply a de novo standard of review in interpreting contracts. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

When construing a contract, we must look to the language of the parties' agreement and give effect to the parties' intentions as expressed in their agreement. *Id.*; *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019) (stating "primary objective" when construing contract is "to give effect to the written expression of the parties' intent"). To determine the contracting parties' intent, we examine the entire agreement and give effect to each provision so that none is rendered meaningless. *Pathfinder Oil & Gas*, 574 S.W.3d at 889; *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015). We give contract terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Pathfinder Oil & Gas*, 574 S.W.3d at 888; *Kachina Pipeline*, 471 S.W.3d at 450. "A contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (internal quotations omitted). "And we assign terms their ordinary and generally accepted meaning unless the contract directs otherwise." *Id.*

18

Contract language that can be given a certain or definite meaning is unambiguous and when it is, we interpret it as a matter of law. *Id.*; *Castillo Info. Tech. Servs., LLC v. Dyonyx, L.P.*, 554 S.W.3d 41, 45 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Whether contract language is ambiguous is also a question of law subject to de novo review. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). Contract language is not ambiguous simply because it is unclear or because the parties "assert forceful and diametrically opposing interpretations." *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006); *see DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). An ambiguity arises only after the application of established rules of interpretation leaves the language susceptible to more than one reasonable meaning. *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015); *DeWitt Cty. Elec. Coop.*, 1 S.W.3d at 100. "Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

In Exxon's summary-judgment motion against National Union, it argued that it was entitled to judgment as a matter of law on its breach of contract and declaratory judgment claims because it was entitled to coverage under the National Union Umbrella Policy. Its assertion that it was entitled to coverage under the National Union Umbrella Policy was premised on its interpretation of Savage's obligation to cover Exxon as an additional insured on its "normal and customary Commercial

19

General Liability insurance coverage and policy limits" under the Exxon-Savage Contract. That interpretation relied on Exxon's position that the term "Commercial General Liability insurance," as referenced in the Exxon-Savage Contract, covers both primary and umbrella or excess insurance. In granting Exxon's summary-judgment motion against National Union on Exxon's breach of contract and declaratory judgment claims, the trial court implicitly adopted this interpretation. But there appears to be a near-consensus of understanding that "commercial general liability insurance" refers to a form of primary policy or coverage and does not encompass umbrella or excess coverage. For instance, the Texas Department of Insurance explains that:

> Commercial General Liability (CGL) insurance protects business owners against claims of liability for bodily injury, property damage, and personal and advertising injury . . . . Premises/operations coverage pays for bodily injury or property damage that occurs on your premises or as a result of your business operations. Products/completed operations coverage pays for bodily injury and property damage that occurs away from your business premises and is caused by your products or completed work.
>
> Excess liability insurance pays for covered losses that exceed your CGL policy's dollar limit.
>
> Umbrella liability insurance is excess liability insurance coverage above the limits of automobile liability and CGL policies. The umbrella policy also provides liability coverage for exposures not covered under the primary CGL insurance policies and not excluded by the umbrella liability insurance policy.

20

TEX. DEP'T OF INS., *Commercial general liability insurance: What is commercial general liability insurance?*, https://www.tdi.texas.gov/pubs/pc/pcgenliab.html (last updated Jan. 20, 2021) (emphasis omitted).  Texas courts consistently use this same language to distinguish commercial general liability policies—i.e., those providing primary coverage—from umbrella or excess policies.  *See, e.g., Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 119–20 (Tex. 2015) ("Brown & Gay was contractually responsible for furnishing the necessary equipment and personnel to perform its duties and was required to maintain insurance for the project, including workers' compensation, commercial general liability, business automobile liability, umbrella excess liability, and professional liability."); *In re Deepwater Horizon*, 470 S.W.3d 452, 462–63 (Tex. 2014) ("Triple S also agreed to carry $500,000 of commercial general liability (CGL) insurance, '[i]ncluding coverage for contractual liability insuring the indemnity agreement,' and $500,000 in excess insurance that followed the form of the CGL policy." (quoting *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660 (Tex. 2008))); *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 752 (Tex. 2013) ("The trial court granted summary judgments for the insurers, and the court of appeals affirmed for all but two: American Dynasty Surplus Lines Insurance Company, which had provided Lennar a $1 million primary commercial general liability policy with an annual $1 million self-insured retention, and Markel American Insurance Company, which had provided a $25 million

21

commercial umbrella policy . . . .”); *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 489 n.1 (Tex. 2008) (“National Union issued several commercial general liability insurance policies to Nokia, covering 1989–1993, as well as three umbrella policies for the period 1998–2001.”); *Trinity Universal Ins. Co. v. Cellular One Grp.*, 268 S.W.3d 505, 505 (Tex. 2008) (“Cellular One tendered the defense of these suits to its insurer . . . from which Cellular One had purchased a number of commercial general liability policies and excess liability policies over a ten-year period.”); *Fed. Ins. Co. v. Samsung Elecs. Am.*, 268 S.W.3d 506, 507 (Tex. 2008) (“Samsung tendered the defense of these cases to [its insurer], from which Samsung had purchased several commercial general liability insurance policies and excess liability policies over an eleven-year period.”); *Daimler-Chrysler Ins. Co. v. Apple*, 265 S.W.3d 52, 64–65 (Tex. App.—Houston [1st Dist.] 2008) (“Here, the insurance policies exclude from coverage ‘publication of material, if done by or at the direction of the insured with knowledge of its falsity,’ as stated in the CGL policy . . . , and defamatory statements ‘done at the direction of you with knowledge of its falsity,’ as stated in the Umbrella policy.”), *rev’d in part on other grounds sub nom. Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248 (Tex. 2009); *but see Liberty Surplus Ins. Corp. v. Exxon Mobil Corp.*, 483 S.W.3d 96, 98 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (“[T]he trial court granted [Exxon]’s traditional motion for partial summary judgment, holding that a contractor’s primary

22

and excess commercial general liability policies provided additional-insured coverage to Exxon for personal-injury claims arising out of the contractor's services."). And a federal district court in Texas recognized the same distinction between commercial general liability insurance and umbrella or excess coverage. *See Pac-Van, Inc. v. CHS, Inc.*, Civil Action No. 3:12-CV-341, 2014 WL 1322761, at *4 (S.D. Tex. Mar. 31, 2014) (order) ("[T]he general understanding of the unmodified term 'commercial general liability insurance' means primary coverage; the designation of 'excess' or 'umbrella' is expected to accompany a policy that provides coverage at higher layers.").

Texas legal practitioners and other professionals understand "commercial general liability" in the same way, specifying that commercial general liability policies are primary policies distinct from umbrella or excess policies. *See* William H. Locke, Jr., *Insurance 101*, 48 TEX. J. BUS. L. 1, 3 (Spring 2019) (defining "umbrella policy" as "[a] policy designed to provide protection against catastrophic losses" that "generally is written over various primary liability policies," including "[a] commercial general liability (CGL) policy" (internal quotations omitted)); Robert H. Etnyre, Jr. & Marcus R. Tucker, *Insurance Coverage Issues Raised by Typical Contractual Indemnity and Additional Insured Provisions in Oil And Gas Contracts*, 57 THE ADVOCATE (TEXAS) 45, 45 (Winter 2011) ("In order to insure their contractual indemnification obligations on land, oil and gas companies and

23

their contractors typically obtain a commercial general liability ('CGL') policy, a commercial auto policy, and sometimes an excess or umbrella policy."); *see also* INT'L RISK MGMT. INST., INC., *Glossary of Insurance and Management Terms*, http://www.irmi.com/online/insurance-glossary/default.aspx) (last visited August 13, 2021) (defining "Commercial General Liability (CGL) Policy" as "a standard insurance policy issued to business organizations to protect them against" various "liability claims" and "Umbrella Liability Policy" as "a policy designed to provide protection against catastrophic losses" that "generally is written over various primary liability policies, such as the business auto policy (BAP), commercial general liability (CGL) policy, watercraft and aircraft liability policies, and employers liability coverage").

The interpretation of "commercial general liability" that Exxon urged in its summary-judgment motion deviates from the generally accepted understanding of the term, and its adoption would disrupt the well-settled understanding of what constitutes commercial general liability insurance coverage reflected in these various authorities as well as in numerous other business agreements which, like the Exxon-Savage Contract, call for one party to provide insurance coverage for another. We reject Exxon's urged interpretation and conclude that the Exxon-Savage Contract provision requiring that Savage provide "normal and customary Commercial General Liability Coverage" to Exxon as an additional insured had only

24

one reasonable, certain, and definite meaning, creating an obligation for Savage to provide primary coverage to Exxon as an additional insured under a commercial general liability policy—but not any obligation to provide coverage under an umbrella or excess policy to Exxon as an additional insured. *See Plains Expl. & Prod.*, 475 S.W.3d at 305 ("We construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." (internal quotations omitted)); *see also RSUI Indem. Co.*, 466 S.W.3d at 119 ("If only one party's construction is reasonable, the policy is unambiguous and we will adopt that party's construction."); *see also In re D. Wilson Constr. Co.*, 196 S.W.3d at 781 (explaining contract language is not ambiguous simply because parties "assert forceful and diametrically opposing interpretations").

In its summary-judgment motion, Exxon also argued that it was automatically entitled to reimbursement under the National Union Umbrella Policy because that policy covered "any person or organization . . . included as an additional insured under Scheduled Underlying Insurance." But that argument ignored the limiting language of the National Union Umbrella Policy provision, which specified that the policy did not provide "broader coverage than would be afforded by such Scheduled Underlying Insurance." Given the unambiguous definition of "commercial general liability" coverage, it is unsurprising that the National Union Umbrella Policy did

25

not expressly incorporate the Exxon-Savage Contract by reference. The limiting language of the National Union Umbrella Policy did incorporate the National Union CGL Policy by reference, though, and the limits of coverage for Exxon as an additional insured under the National Union CGL Policy, in turn, were informed by its incorporation of the Exxon-Savage Contract. We may not read the National Union CGL Policy's inclusion of Exxon as an "additional insured" without reference to the incorporated Exxon-Savage Contract because doing so would render the National Union Umbrella Policy's limiting clause meaningless. *See Kachina Pipeline*, 471 S.W.3d at 450. Because coverage available to Exxon as an additional insured under the National Union CGL Policy, through its incorporation of the Exxon-Savage Contract, makes clear that Exxon's status as an additional insured is limited to primary coverage, Exxon is not entitled to coverage under the National Union Umbrella Policy as an "additional insured."

Thus, Exxon was not entitled to summary judgment on its breach of contract claim against National Union or a declaration that "National Union . . . [was] liable to Exxon . . . for $20,087,144.29 under the [National Union] Umbrella Policy in connection with the settlement of the *Roberts* [litigation] and the Munoz [c]laim." (Emphasis added.) Further, National Union was entitled to summary judgment as a matter of law on Exxon's breach of contract and declaratory judgment claims

because no genuine of material fact demonstrated that National Union had breached the terms of a valid contract.

For these reasons, we hold that the trial court erred in granting Exxon's summary-judgment motion and denying National Union's summary-judgment motion on Exxon's breach of contract and declaratory judgment claims against National Union.

We sustain National Union's first issue.

Our resolution of National Union's first issue makes it unnecessary to address National Union's second issue, in which it argues that the trial court erred in granting summary judgment in favor of Starr and in denying National Union summary judgment on whether the Starr Bumbershoot Policy provided the coverage sought by Exxon. Our conclusion that the Exxon-Savage Contract required only that Savage provide coverage under a commercial general liability policy, which is primary coverage, and did not require Savage to provide coverage under an umbrella policy, eliminates the need to address that issue. *See* TEX. R. APP. P. 47.1. It is also unnecessary to address National Union's third and fourth issues in which National Union argues that the trial court erred in awarding Exxon damages, attorney's fees, costs, and pre-judgment interest. *See id.* Instead, because we have reversed the summary judgment in favor of Exxon on its breach of contract and declaratory judgment claims, we reverse the portion of the trial court's judgment awarding

27

Exxon attorney's fees, expenses, and pre-judgment interest and remand this case to the trial court for reconsideration of the parties' requests for attorney's fees and costs. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.009, 38.001(b)(8); *Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 885 (Tex. 2016) ("Where the extent to which a party prevailed has changed on appeal, our practice has been to remand the issue of attorney['s] fees to the trial court for reconsideration of what is equitable and just."); *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009) ("To recover fees under [Texas Civil Practice and Remedies Code section 38.001], a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages."); *Castille v. Serv. Datsun, Inc.*, No. 01-16-00082-CV, 2017 WL 3910918, at *10–11 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet.) (mem. op.) ("[A]n award of attorney's fees under the DJA is not conditioned upon a party prevailing on . . . [a] declaratory judgment claim.").

### Exxon's Appeal

In its first issue, Exxon argues that the trial court erred in granting summary judgment in favor of Starr and denying Exxon's summary-judgment motion against Starr on Exxon's breach of contract and declaratory judgment claims because Exxon is an "Assured" under the Starr Bumbershoot Policy and is therefore entitled to coverage under that policy for the amounts Exxon paid to settle the *Roberts* litigation and the Munoz claim.

28

This argument relies on Exxon's above-urged interpretation of the Exxon-Savage Contract's requirement that Savage obtain "normal and customary Commercial General Liability Coverage" for Exxon as an additional insured, an interpretation that we have already rejected. Because the Starr Bumbershoot Policy is an umbrella policy, Exxon has no contractual right to coverage under that policy as a matter of law. As a result, we hold that the trial court did not err in granting Starr summary judgment on Exxon's breach of contract and declaratory judgment claims against it.

We overrule Exxon's first issue.

Our disposition of Exxon's first issue makes it unnecessary to reach Exxon's remaining issues. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the portion of the trial court's judgment granting Exxon's summary-judgment motion against National Union and render judgment granting National Union's summary-judgment motion against Exxon on Exxon's breach of contract and declaratory judgment claims against National Union. We also reverse the portion of the trial court's judgment awarding Exxon attorney's fees and expenses against National Union. We affirm the portion of the trial court's judgment granting Starr's summary-judgment motions against National Union and Exxon and denying National Union's and Exxon's summary-judgment motions against Starr.

29

We remand the issue of whether to award attorney's fees and costs to the trial court for further proceedings consistent with this opinion.[8]  We affirm the remainder of the trial court's judgment.

Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Landau and Countiss.

---

[8]    *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.009, 38.001(b)(8).